Filed 6/7/16  Terry v. Morgan Lewis & Bockius CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| TARA TERRY, | B262463 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC503094) |
| v. | |
| MORGAN LEWIS & BOCKIUS, LLP, et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Terry A. Green, Judge.  Affirmed.

Tara Terry, in pro. per., for Plaintiff and Appellant.

Morgan, Lewis & Bockius and Jason S. Mills for Defendants and Respondents.

_____

Plaintiff and appellant Tara Terry was a legal secretary employed by defendant and respondent Morgan, Lewis & Bockius LLP (the firm). Believing she was not being paid what she had been promised, she brought suit, alleging breach of contract. At one point, she took medical leave. In her breach of contract lawsuit, Terry also alleged she was retaliated against for taking medical leave. That lawsuit was resolved against Terry on summary judgment. Terry subsequently brought the current action against the firm, alleging, among other things, that the firm improperly retaliated against her for pursuing the first lawsuit. The firm prevailed on summary judgment and Terry appeals. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

Because several of Terry's causes of action in the current litigation allege retaliation for her pursuit of the prior litigation, we must discuss the prior litigation.

1. *Terry's Original Action Against the Firm*

In September 2005, Terry gave notice that she intended to quit working at the firm in order to take a job with a bank offering a better salary. According to Terry, the firm agreed to match the bank's offer, including an increased salary and an annual bonus, in order to persuade her to stay with the firm. Terry rejected the bank's offer and remained with the firm. Thereafter, the firm refused to pay her the promised annual bonus.

In 2009, Terry took medical leave. The firm asked Terry for her diagnosis; Terry refused to provide it and eventually returned to work.

Before filing a lawsuit, Terry filed an administrative complaint under the Fair Employment and Housing Act (FEHA), raising both breach of contract and medical leave privacy issues. On September 22, 2009, representing herself, Terry filed suit against the firm for breach of the oral contract to pay her the promised bonus, and for retaliating against her for taking medical leave by requesting her diagnosis. We refer to this lawsuit as the "first lawsuit."

Terry's lawsuit was unsuccessful. Summary judgment was granted in favor of the firm on all causes of action in 2010. Terry appealed. On February 28, 2012, we affirmed

2

the judgment of the trial court.  (*Terry v. Morgan Lewis & Bockius, LLP* (Feb. 28, 2013, B228699) [nonpub. opn.].)

2.      *Terry's Reports of Alleged Billing Improprieties*

In the prior lawsuit, the issue of "value billing" arose.  The record does not contain a clear explanation of value billing; the practice appears to involve billing for the value of the task performed rather than the hours taken to perform it.  According to Terry, one of the partners at the firm told her that she could obtain the equivalent of the withheld bonus through the practice of "value billing."  Terry did not; she believed doing so would be illegal and unethical.  The partner who had encouraged her to value bill admitted to Terry that he value billed; Terry believed that this, too, was illegal and unethical.  In the course of her lawsuit, Terry testified that the partner admitted value billing.  At one point, Terry attempted to contact the State Bar to report the firm for value billing; the Bar advised Terry that she could not make a complaint because she was not a client.[1]

3.      *Alleged Mistreatment*

Terry would ultimately allege in the present lawsuit that she was subject to mistreatment at the firm in retaliation for her pursuit of the prior lawsuit and her complaints about value billing.

Terry was on leave when she filed the first lawsuit; she did not return until December 15, 2009.  Terry asserts she was mistreated upon her return, continuing until June 2, 2010, when she again took leave and did not return to work.  We describe the alleged mistreatment next.

---

[1]      Whether any billing practices of the firm were improper is outside the scope of this opinion; such a determination could not be made without evidence of the terms of the firm's fee agreements with its clients.

3

A. *Alleged Mistreatment – Pre-April 11, 2010*[2]

In Terry's deposition in this case, she reported that when she returned to work in December 2009, other people at the firm treated her differently. People who previously had been friendly to her were less so. Some stared; others rolled their eyes or snickered at her. Some slammed doors and yelled. Others would see her walking in the hallway and turn to go in the other direction. Once, when plaintiff was in the ladies' room with another woman, that woman threw her purse in Terry's direction, and it landed on a shelf near the bathroom mirror, without touching Terry. Terry believed the coworker had thrown the purse at her. There was a clerk in the mailroom who would walk up to Terry and say, "You're improper," which she thought might have been a mis-reading of "in pro. per." The clerk repeatedly told Terry he knew where she lived; this frightened her.

Barbara Fitzgerald was the attorney at the firm defending the firm against Terry's first lawsuit. On January 12, 2010, Fitzgerald called Terry into her office to discuss the suit. Terry complained to Fitzgerald about the hostile response she had received from others in the firm. Fitzgerald responded, "No one likes being sued." Fitzgerald also explained that body language is a matter of interpretation. Terry believed that Fitzgerald's statement that "[n]o one likes being sued," was an admission by the firm that all of the negative treatment Terry had received, and would continue to receive in the future, was in retaliation for Terry's lawsuit against the firm.[3]

In February 2010, Terry was moved from a desk where she worked for a partner to a desk where she worked for two associates. Her pay was the same, but she believed the move would negatively affect her future salary and seniority status. After she changed stations, she asked another secretary to assist her in gaining some information; the other

---

[2]    Because, as we shall discuss, there is an issue as to whether some of Terry's claims are time-barred, we separate our description of the alleged mistreatment into pre- and post-April 11, 2010 acts. The date chosen is one year before she filed her administrative complaint, on April 11, 2011. (Gov. Code, § 12960, subd. (d).)

[3]    There is no claim that it was improper for Fitzgerald to discuss the lawsuit with Terry. Terry was representing herself. (Rules Prof. Conduct, rule 2-100(A).)

secretary stared at her, ignoring her request. An attorney intervened and obtained the information for Terry.

On March 11, 2010, Terry sent an e-mail to two attorneys at the firm to inform them of the treatment she had received. They responded to her concerns, and immediately followed-up with the individuals she had identified. They sought details in order to continue their investigation.

B. *Alleged Mistreatment – Post-April 10, 2010*

While Terry alleges that, in general, the mistreatment continued until she went on leave in June 2010, she identified only two specific incidents of mistreatment after April 10, 2010.

The first occurrence is the so-called perfume incident. According to Veronica Marquez, the Secretarial Services Supervisor at the firm, she received complaints from two secretaries who worked near Terry that the fragrance Terry wore at her desk "overwhelmed their workspace, causing allergic reactions and trouble breathing." Marquez discussed the matter with Human Resources (HR) Manager Beth Naples, and the two agreed that Marquez should discuss the issue with Terry. On May 3, 2010, Marquez met Terry in a conference room, explained that she had received complaints, and asked that Terry be conscientious about the amount of perfume she wore at work. Shortly thereafter, Marquez received another complaint, from secretary Vicky Rader, who claimed that Terry's fragrance triggered her asthma and required her to use her inhaler. On May 7, 2010, Marquez sent Terry an e-mail, informing her of Rader's complaint. She asked that Terry "please show courtesy and respect to [her] fellow employees by reducing [her] use of perfume."

Thereafter, there was an encounter between Terry and HR Manager Naples, in which Naples smelled Terry's hands, checking for fragrance. The evidence is disputed as to who instigated this meeting. The evidence is also disputed as to whether Naples inspected Terry for odor (as Terry declared) or if Terry thrust her arm near Naples's face in order to prove there was no offensive scent (as Naples testified). It is undisputed that the source of the offensive fragrance was never discovered. Terry testified that Naples

5

speculated aloud that Terry was just one of " 'those people' who emit odor." Naples denied this. Terry believes the entire incident was retaliatory, harassing, and racially discriminatory.

The second specific incident of mistreatment after April 11, 2010 occurred after Terry's May 2010 deposition in the first lawsuit. Terry was sitting at her desk and a visiting attorney from another firm complimented Terry on her appearance. A firm lawyer became angry, pointed at her, and said, "No more nothing for you. No more pretty hair. No more nice anything. That's it. You are an [employee] number. That's all you are." He went into his office and slammed the door. Terry believed that the outburst was a reaction to her deposition testimony.

4.      *Terry Resigns*

Terry took medical leave on June 4, 2010, and never returned to the firm. Her employment terminated following of a series of e-mails.

On April 25, 2011, Terry wrote HR Manager Naples, seeking "emergency access" to her cash balance account so that she could pay for necessary medical expenses. In her e-mail, Terry wrote, "Because of the nature and extent of my injury there are no accommodations that Morgan Lewis can make that would allow me to return to work at Morgan Lewis."

That same day, Naples responded that she had checked with "Firm Benefits" and learned there was no provision for emergency access to the cash balance account. Naples wrote that, in order to access the funds, a plan participant "must be age 62 and meet other retirement eligibility requirements or the participant must no longer be employed by the Firm." Naples then noted that Terry had written that Morgan Lewis could make no accommodations that would enable her to return to work. Naples explained, "once an employee informs us of his/her indefinite inability to return to work, we typically move forward with the termination of employment." She asked Terry how Terry would like the firm to proceed.

Terry wrote back on June 3, 2011 stating, "There is no ambiguity regarding the meaning of 'there are no accommodations that could be made that would allow me to

6

return to work at Morgan Lewis.' I cannot and will not return to Morgan Lewis. [¶] Accordingly, please proceed with the appropriate course of action."

Naples responded, "We interpret your response as a resignation, and will process it accordingly. If our understanding is incorrect, then please advise us immediately." Terry did not so advise Naples, and Morgan Lewis processed Terry's resignation.

Terry would later testify at deposition that when she had written that there were no accommodations that Morgan Lewis could make to enable her to return to work, what she had meant was that there were no accommodations Morgan Lewis *could* make because Morgan Lewis *did not want* to make accommodations and had instead wanted to harass and retaliate against her.

5.  *Terry Attempts to Confirm Prior Employment*

In April 2012, Morgan Lewis received an employment verification request from an entity called HireRight, requesting confirmation of Terry's dates of employment with Morgan Lewis. The firm wrote Terry, setting forth her dates of employment and asking her to authorize the firm to respond to HireRight with those dates. Terry responded with a request to include the employment dates for a firm called Zevnik Horton which had merged with Morgan Lewis. Terry had worked with Zevnik Horton at the time of the merger and then joined Morgan Lewis.

Initially, Morgan Lewis balked, indicating that it could not confirm employment at any entity other than Morgan Lewis. On September 5, 2012, Terry wrote an attorney at Morgan Lewis asking him to "remedy[] this matter promptly." Although the attorney first refused, on September 6, 2012, he indicated that the firm was willing to state "on an appropriate reference form" the dates of Terry's employment with Zevnik Horton. He wrote, "We need for you to send us a specific employment verification form along with an authorization permitting us to release this information. You can send the forms to my attention and I will make sure they are reviewed and completed promptly by HR." Terry never sent the employment verification forms.

7

At her deposition, Terry testified that her complaint was not that Morgan Lewis would not confirm her dates of employment with Zevnik Horton, but that the firm refused to confirm the dates she had been employed by Morgan Lewis itself.

6.  *Initiation of Present Lawsuit*

On March 18, 2013, after we filed our opinion in the first appeal, Terry, representing herself, filed her complaint in the present action. It alleged 10 causes of action, although only eight of them are relevant.[4] Terry alleged the following causes of action:

First cause of action: retaliation for her pursuit of her underlying action and FEHA complaint;

Second cause of action: disparate treatment for her pursuit of her legal rights under FEHA and state law;

Third cause of action: racial discrimination, arising out of the perfume incident;

Fourth cause of action: hostile work environment, for pursuit of her rights under FEHA;

Fifth cause of action: constructive discharge, in that she was forced to resign due to intolerable conditions;

Sixth cause of action: whistleblower, in that she was retaliated against for pursuing her rights under FEHA and state law; as the litigation proceeded, this changed into a cause of action for retaliation because she attempted to report the firm's improper value billing practices to authorities;

Seventh cause of action: intentional infliction of emotional distress, for the alleged retaliatory acts; and

Eighth cause of action: preventing subsequent employment by misrepresentation, arising out of the firm's failure to confirm with HireRight her employment dates.

---

**4**     The remaining two causes of action, breach of contract and breach of the implied covenant of good faith and fair dealing, were reassertions of similar causes of action resolved against Terry in her first lawsuit. Terry no longer pursues those causes of action.

On April 11, 2011, Terry had filed an administrative complaint with the Department of Fair Employment and Housing. A right-to-sue letter had issued on March 19, 2012. Terry filed her complaint within one year of that letter.

7.     *The Firm's Motion for Summary Judgment*

On September 10, 2014, the firm moved for summary judgment.[5] Relying on declarations of the individuals allegedly involved and excerpts from Terry's deposition, the firm argued that there were no adverse employment actions and no improper retaliation. It argued that Terry did not suffer a hostile work environment, and that there were no intolerable conditions at the time of Terry's resignation. As for the whistleblowing cause of action, the firm argued that it had no knowledge of any complaint Terry made regarding its billing practices. The firm argued Terry's cause of action for intentional infliction of emotional distress was time-barred. Finally, as to the cause of action for preventing subsequent employment by misrepresentation, the firm argued that it made no false representation.

8.     *Procedural Issues Relating to the Summary Judgment Motion*

On appeal, Terry contends the trial court erred in not continuing the hearing to December 15, in that she had not consented to electronic service of the motion. We briefly recite the pertinent facts.

The firm set the motion for hearing on November 24, 2014, but it erroneously served the motion papers at Terry's former address. When Terry brought the mistake to the firm's attention, the firm immediately re-served the motion on Terry, at the correct address, on October 1, 2014. Realizing that Terry did not have the statutory 75 days' notice between the new service and the November 24 hearing date, the firm filed an ex

---

[5]     We are somewhat hampered in our discussion of the firm's motion because Terry did not designate for inclusion in the record on appeal all of the firm's moving papers. Specifically, she failed to designate the firm's points and authorities in support of its motion for summary judgment. While the firm could have counter-designated the missing document, it is the appellant's burden to provide an adequate record on appeal. To the extent the record is inadequate, we make all reasonable inferences in favor of the judgment. (*Rossiter v. Benoit* (1979) 88 Cal.App.3d 706, 712.)

parte application to continue the hearing date to December 15, 2014 – a date to which Terry agreed.

However, the firm's ex parte moving papers attached e-mails reflecting that, on September 10, 2014, Terry had requested an electronic version of the firm's points and authorities to be sent to her. The firm agreed to e-mail Terry all of its moving papers, and did so that day. At the hearing on the firm's ex parte application, the court concluded that service had been made electronically on September 10, 2014; it continued the hearing on the summary judgment motion, but only to November 26, 2014.[6]

Additionally, in the course of her e-mail informing the firm that she would not oppose the firm's ex parte application, Terry represented that she had spoken with counsel who would "be able to assist with a mandatory settlement conference." The court's order on the ex parte motion referred the matter to the court's mandatory settlement conference program. The firm was ordered to obtain the necessary paperwork and provide it to Terry; the firm attached the paperwork to the notice of ruling on the ex parte application. The court's paperwork for the mandatory settlement conference program includes the following sentence: "***Please note that all parties must be represented***" Terry ultimately did not retain counsel, and believed she was therefore prohibited from participating in a mandatory settlement conference.

9.      *Disposition of the Summary Judgment Motion*

Terry opposed the firm's summary judgment motion with her own declaration and several exhibits. Much of Terry's declaration included legal conclusions, rather than factual statements. Terry's declaration also included hearsay statements. The firm interposed numerous objections to Terry's declaration, many of which were sustained by the trial court.

After a hearing, the trial court granted summary judgment, concluding no triable issues of material fact existed. Judgment was entered in favor of the firm. Terry filed a timely notice of appeal.

---

[6]      Electronic service extends the required notice period by two court days. (Code Civ. Proc., § 1010.6, subd. (a)(4).)

10

**DISCUSSION**

We first address Terry's procedural arguments – that the court erred in not continuing the summary judgment motion to December 15, and the court erroneously barred her from participating in the mandatory settlement conference. Next, we turn to the summary judgment motion, discussing Terry's challenges to the court's evidentiary rulings before addressing the summary judgment motion on the merits.

1. *No Prejudicial Error Established in Failing to Continue the Hearing*

Terry first contends the court erred in not continuing the summary judgment hearing to December 15. Specifically, she argues that the court erred in finding that she had consented to electronic service of the summary judgment moving papers. But the record before the court unambiguously indicated Terry requested an e-mail copy of the firm's points and authorities, and, in response, was served with all moving papers electronically. On appeal, Terry represents that she was prejudiced by the court's ruling, but does not state that she did not actually obtain service of the documents electronically on September 10, 2014.[7] Moreover, the record indicates Terry made no argument to the trial court that she would be prejudiced without a further continuance of the hearing, nor did she seek a continuance in her opposition to the summary judgment motion. As such, she not only failed to establish error or prejudice, but her point on appeal is waived. (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1138.)

2. *No Error Established in Connection with the Mandatory Settlement Conference*

Terry next contends the court erred by failing to allow her to participate in the mandatory settlement conference because she was self-represented. Nothing in the record indicates, however, that the trial court rejected any request by Terry that she be able to participate in a settlement conference. She simply presented forms issued by the

---

[7]    Terry suggests that electronic service was of no use to her, as she lacked the ability to view or print e-mail attachments. There is no indication that she informed the firm of this when requesting an electronic copy of the points and authorities, nor that she informed the court of this in connection with the ex parte application.

court. And there is no adverse ruling Terry challenges on appeal. In this sense, the record fails to demonstrate reversible error.

Having said that, we are nevertheless concerned that the court's notice uses language such as "all parties must be represented." This phrasing could be misleading and possibly suggest that only parties who have lawyers may attend settlement conferences. In reviewing local rules governing settlement conferences, we see no express indication that self-represented litigants are barred from participation in settlement conferences. (Super. Ct. L.A. County, Local Rules, rule 3.25(d).)[8]

Of concern is the Los Angeles Superior Court's website, which in its description of the judicial mandatory settlement conference program expressly bans self-represented litigants from participation: "This program is available in general jurisdiction cases *with represented parties* from independent calendar (IC) and Central Civil West (CCW) courtrooms." (http://www.lacourt.org/division/civil/CI0109.aspx (as of June 7, 2016); italics added.)

To the extent the Los Angeles Superior Court rule limits judicial mandatory settlement conferences to represented parties it appears now may be the time to reexamine such a rule. Self-represented litigants are not entitled to special consideration from judges.[9] But there is a corollary: "Although self-represented litigants are not entitled to special treatment, they are entitled to the same treatment as a represented

---

[8] Rule 3.25(d)(3) provides: "Counsel must attend the settlement conference and be familiar with the pertinent available evidence involving both liability and damages. Counsel must be prepared to discuss the case in depth and, except for good cause shown, must be the person who will try the case." There is nothing in the rule that explicitly precludes self-represented litigants from participating, although the phase, "Counsel must attend" could imply a prohibition of those who are self-represented.

[9] The rigidity of this rule has been recently tempered. "The obligation of a judge to dispose of matters promptly and efficiently must not take precedence over the judge's obligation to dispose of the matters fairly and with patience. *For example, when a litigant is self-represented, a judge has the discretion to take reasonable steps, appropriate under the circumstances and consistent with the law and the canons, to enable the litigant to be heard.*" (Cal. Code of Judicial Ethics, *Com.* to Canon 3B(8).)

12

party." (*Petrosyan v. Prince Corp.* (2013) 223 Cal.App.4th 587, 594.) Similarly, "We further note that in pro. per. litigants are not entitled to special exemptions from the California Rules of Court or Code of Civil Procedure. [Citation.] They are, however, entitled to treatment equal to that of a represented party." (*Gamet v. Blanchard* (2001) 91 Cal.App.4th 1276, 1284; cf. *Elkins v. Superior Court* (2007) 41 Cal.4th 1337.)

While there may be reasons for excluding self-represented litigants from settlement conferences in certain cases, we doubt a blanket rule excluding self-represented litigants from settlement programs is appropriate. It is clear that there is no statewide policy that would support such an assembly line rule. For example, in family law courts, Family Code section 3170 makes mediation mandatory for contested custody and visitation orders, and the Los Angeles Superior Court website explains that the parents must attend the mediation, attorneys "may attend the mediation appointment but are not required to do so," and if both parents are represented either both attorneys or no attorneys may participate in the mediation. (http://www.lacourt.org/division/familylaw/ FL0057.aspx (as of June 7, 2016).) The family law rules suggest that there are methods by which self-represented litigants can participate in settlement conferences at least in some situations, even if special care must be taken to ensure the orderly handling of the conference.

Even though we have expressed our concerns about what may be a uniform practice, in this case there was no order by the trial court that precluded Terry from attending any settlement conference; nor has she demonstrated legal error emanating from her decision not to attend or to press the matter further with the trial court.

3. *No Error Established in Evidentiary Rulings in Connection with Summary Judgment*

On appeal, Terry argues the court erred in excluding evidence she submitted in connection with her opposition to the summary judgment motion. Terry makes no meritorious argument against any evidentiary rulings made by the trial court. To the extent she challenges the trial court's evidentiary rulings without argument or authority,

13

we disregard the evidence to which objections were sustained. (*Loggins v. Kaiser Permanente Internat.* (2007) 151 Cal.App.4th 1102, 1108, fn. 5.)

The evidentiary arguments she does make are as follows:

Terry first argues that the trial court improperly excluded the evidence of three documents from the prior action that she submitted in opposition to the firm's summary judgment motion. But the firm objected to only one of the identified documents, and its objection was overruled.

Terry next argues that the court excluded her evidence that attorney Fitzgerald admitted "no one likes being sued." She argues that the evidence was admissible because it established the firm's motive. But Terry's declaration did not state only that Fitzgerald made the statement; instead Terry declared that "Defendant admitted the motive behind its retaliatory, harassing and hostile illegal conduct was because 'no [one] likes being sued' as a result of me seeking my rights under the [FEHA] and California law." The firm objected to the statement as a legal conclusion, speculative and improper argument. It was Terry's characterization of the statement that was objectionable; Terry makes no argument on appeal that the court erred in sustaining the firm's objection on these bases. We therefore consider the objections properly sustained.[10]

Terry argues that the court erred in excluding most of her declaration as inadmissible hearsay. She argues that her declaration simply explained her deposition testimony, and should therefore be considered admissible. The argument does not follow. Even if a declaration explains deposition testimony, the declaration must still comply with the rules of evidence. In many respects, Terry's declaration did not do so.[11]

---

[10]    Even if we consider Terry's characterization of the statement as argument, we do not find Fitzgerald's statement to be the smoking gun Terry thinks it is. As we read it, Fitzgerald was not admitting an intentional firm-wide plan to retaliate against Terry; the only reasonable inference from the statement is that she was simply speculating as to why some of Terry's coworkers were less than friendly with her upon her return from leave.

[11]    For example, Terry declared that she "was advised by a coworker . . . that human resources sought out employees to complain about plaintiff's odor." The statement is

14

On appeal, Terry fails to identify any specific statement in her declaration to which she contends an objection was erroneously sustained. We therefore presume the court's rulings were correct.

Terry also argues that the court improperly excluded her "admissible circumstantial evidence." A careful reading of her argument reveals not a claim that the court improperly excluded the evidence, but that it did not find her evidence sufficient to raise a triable issue of material fact. This goes to the merits of the court's ruling on summary judgment, to which we now turn.

4.      *Summary Judgment was Appropriately Granted*

" 'A defendant is entitled to summary judgment if the record establishes as a matter of law that none of the plaintiff's asserted causes of action can prevail.' [Citation.] The pleadings define the issues to be considered on a motion for summary judgment. [Citation.] As to each claim as framed by the complaint, the defendant must present facts to negate an essential element or to establish a defense. Only then will the burden shift to the plaintiff to demonstrate the existence of a triable, material issue of fact. [Citation.]" (*Ferrari v. Grand Canyon Dories* (1995) 32 Cal.App.4th 248, 252.) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850.) We review orders granting or denying a summary judgment motion de novo. (*FSR Brokerage, Inc. v. Superior Court* (1995) 35 Cal.App.4th 69, 72; *Union Bank v. Superior Court* (1995) 31 Cal.App.4th 573, 579.)

We exercise "an independent assessment of the correctness of the trial court's ruling, applying the same legal standard as the trial court in determining whether there are any genuine issues of material fact or whether the moving party is entitled to judgment as a matter of law." (*Iverson v. Muroc Unified School Dist.* (1995) 32 Cal.App.4th 218, 222.)

---

clearly inadmissible hearsay. Terry did not submit a declaration from the identified coworker.

A.    *Causes of Action for Retaliation and Disparate Treatment*

We consider Terry's first cause of action for retaliation and her second cause of action for disparate treatment together.  Both claims allege that Terry was retaliated against for her pursuit of the prior action when she returned to work in December 2009.

FEHA prohibits retaliatory employment practices.  It is unlawful "[f]or any employer . . . or person to . . . discriminate against any person because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part." (Gov. Code, § 12940, subd. (h).)

The courts have adopted a three-stage burden-shifting test for trying claims of retaliation.  The plaintiff initially has the burden to "show:  (1) [plaintiff] engaged in a 'protected activity,' (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action.  [Citations.]  Once an employee establishes a prima facie case, the employer is required to offer a legitimate, nonretaliatory reason for the adverse employment action.  [Citation.]  If the employer produces a legitimate reason for the adverse employment action, the presumption of retaliation ' " 'drops out of the picture,' " ' and the burden shifts back to the employee to prove intentional retaliation.  [Citation.]" (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042.)

The firm obtained summary judgment on the basis that Terry could not establish the second element of her prima facie case – that she was subjected to an adverse employment action.  In the firm's motion for summary judgment, the firm relied on Terry's deposition testimony that her reassignment from a partner's desk to a desk supporting two associates was the only adverse employment action committed against her.  The firm argued that this act of reassignment was not adverse and, in any event, was time-barred, because it occurred more than one year before Terry filed her administrative complaint in April 2011. (Gov. Code, § 12960, subd. (d).)  In opposition to the summary judgment motion, Terry claimed that "comments and threats of violence by coworkers" also constituted an adverse employment action.  She did not specifically identify those

16

comments or threats of violence, but stated that defendant was on notice of those acts as early as January 2010. Even if we consider the "comments and threats of violence," those comments and threats also occurred more than one year before Terry filed her administrative complaint. Terry has failed to identify any adverse employment action within the one-year period prior to her administrative complaint.[12]

Terry attempts to avoid this result by relying on the continuing violation doctrine. Under this doctrine, the statute of limitations does not start to run on a course of discriminatory conduct until the course of conduct is brought to an end or the employee is on notice that further efforts to end it will be in vain. (*Jumaane v. City of Los Angeles* (2015) 241 Cal.App.4th 1390, 1400.) "The continuing violation doctrine requires proof that the conduct occurring outside the limitations period was (1) similar or related to the conduct that occurred [within it]; (2) the conduct was reasonably frequent; and (3) the conduct had not yet become permanent." (*Id*. at p. 1402.) Terry's attempts to rely on the continuing violation doctrine fail because the conduct occurring after April 11, 2010 was not similar or related to conduct that occurred before it. Before the key date, Terry was reassigned to a different desk; nothing remotely similar or related to that occurred after the date. After the date, Terry suffered the perfume incident; nothing similar or related to that occurred before. While Terry suggests that the "comments and threats of violence" occurred throughout Terry's return to work – from December 2009 through to June 2010 – she failed to indicate the timing of these acts and the frequency with which they allegedly occurred – identifying only a single such incident in the post-April 10, 2010

---

**12**     In her opposition to the firm's separate statement, Terry also argued that she was subject to retaliation "as a result of her complaints against the firm's billing practices because immediately following her deposition testimony regarding the firm's billing practices" she was verbally attacked and physically threatened. Terry's suggestion that she was retaliated against for testifying at deposition about the firm's billing practices does not support a cause of action for FEHA retaliation because it fails on the first element – a protected act. While unlawful billing practices are definitely forbidden, they are not prohibited by FEHA. As such, no cause of action for FEHA retaliation exists for testifying to such practices.

period (and attributing that to her deposition). This is not sufficient to establish a continuing violation.

B.    *Cause of Action for Racial Discrimination*

Terry's third cause of action for racial discrimination is based on the perfume incident. Although there appeared nothing overtly racial about the incident, Terry argues that it was racially discriminatory because of Naples's comment that Terry was one of " 'those people' who emit odor," a comment which, according to Terry, impliedly asserts a stereotypical belief that African-Americans give off an unpleasant odor. Terry is African-American.

FEHA bars racially discriminatory employment practices. It is an unlawful employment practice "[f]or an employer, because of the race . . . of any person, to . . . discriminate against the person in compensation or in terms, conditions, or privileges of employment." (Gov. Code, § 12940, subd. (a).) As with retaliation, a three-stage burden-shifting analysis applies. (*Guz v. Bechtel National Inc.* (2000) 24 Cal.4th 317, 354.) The plaintiff must provide evidence that "(1) [plaintiff] was a member of a protected class, (2) [plaintiff] was qualified for the position . . . sought or was performing competently in the position . . . held, (3) [plaintiff] suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) some other circumstance suggests discriminatory motive." (*Id.* at p. 355.) Once the plaintiff has established a prima facie case, a presumption of discrimination arises. The burden then switches to the employer to rebut the presumption by producing admissible evidence sufficient to raise a genuine issue of fact that its action was taken "for a legitimate, nondiscriminatory reason." (*Id.* at pp. 355-356.) It does not matter if the employer's reasons were not wise or correct, as long as they were nondiscriminatory. (*Id.* at p. 358.) Once the employer has met the burden, the presumption of discrimination disappears. "The plaintiff must then have the opportunity to attack the employer's proffered reasons as pretexts for discrimination, or to offer any other evidence of discriminatory motive." (*Id.* at p. 356.) "The ultimate burden of persuasion on the issue of actual discrimination remains with the plaintiff." (*Ibid.*)

18

Summary judgment was granted on the basis that there was no adverse employment action. Even accepting Terry's view of her encounter with Naples, Naples's sniffing of Terry's hands and her claimed uncouth comment did not affect plaintiff's working conditions. Terry was not disciplined in any way. Her workspace was not relocated to avoid interaction with the other secretaries. Indeed, nothing further occurred after the meeting with Naples.

The undisputed evidence establishes that the encounter with Naples itself occurred only after three complaints about Terry's apparent overuse of perfume had been made – one *after* Marquez had already asked Terry to reduce her use of perfume.[13] Thus, when Naples smelled Terry's hands, she was responding to workplace complaints and Terry's protestations of innocence. As such, the firm established that Naples's actions were taken for a legitimate non-discriminatory reason. In contrast, Terry offered no evidence of discriminatory motive. She simply inferred that Naples's statement about people who emit odor, which was racially-neutral on its face, was, in fact, racially-motivated. This is insufficient to give rise to a triable issue of fact.

C.      *Cause of Action for Hostile Work Environment*

Terry's fourth cause of action for hostile work environment alleged that the firm's harassing conduct in retaliation for her pursuit of her rights under FEHA constituted a hostile work environment.

FEHA declares harassment on any improper basis to constitute an unlawful employment practice. (Gov. Code, § 12940, subd. (j)(1).) Not every act of harassment is actionable, however. Instead, in order to constitute actionable harassment, the harassment must "be sufficiently severe or pervasive so as to alter the conditions of employment and create an abusive working environment. [Citations.]" (*Dickson v. Burke Williams, Inc.* (2015) 234 Cal.App.4th 1307, 1312.) The firm obtained summary judgment on the basis that there was no evidence of any severe or pervasive conduct sufficient to alter the conditions of Terry's employment.

---

**13**     Terry's suggestion that the firm attempted to encourage her coworkers to complain about her perfume is unsupported by admissible evidence.

19

This ruling was correct. On appeal, plaintiff makes no legal argument that the conduct on which she relies was sufficiently severe or pervasive to establish an abusive working environment. Instead, she simply restates the categories of harassing activity to which she was subjected (e.g., "physical threats, verbal attacks") without ever indicating the specifics or the frequency of such acts and without tying those acts to applicable legal authority. Terry also relies on the firm's failure to provide her employment dates to HireRight. As this occurred after her employment terminated, it could not have created a hostile work environment. Plaintiff has failed to raise a triable issue of fact on this claim.

D.      *Cause of Action for Constructive Discharge*

Terry's fifth cause of action for constructive discharge alleged that she was forced to resign her employment due to intolerable working conditions. " 'Constructive discharge occurs when the employer's conduct effectively forces an employee to resign. Although the employee may say, "I quit," the employment relationship is actually severed involuntarily by the employer's acts, against the employee's will. As a result, a constructive discharge is legally regarded as a firing rather than a resignation. [Citation.]' [Citation.]" (*Colores v. Board of Trustees* (2003) 105 Cal.App.4th 1293, 1305.) " 'In order to establish a constructive discharge, an employee must plead and prove, by the usual preponderance of the evidence standard, that the employer either intentionally created or knowingly permitted working conditions that were so intolerable or aggravated at the time of the employee's resignation that a reasonable employer would realize that a reasonable person in the employee's position would be compelled to resign.' " (*Ibid.*) " 'In order to amount to a constructive discharge, adverse working conditions must be unusually "aggravated" or amount to a "continuous pattern" before the situation will be deemed intolerable.' [Citation.]" (*Id.* at p. 1306.)

While summary judgment on this cause of action was properly granted for the same reason summary judgment was properly granted for the hostile work environment cause of action, there is a second reason. The firm established, via the course of e-mails giving rise to Terry's termination of employment, that Terry quit because, due to the nature and extent of her disability, she believed there were no accommodations that could

20

be made that would enable her to return to work.  When given the opportunity to clarify that statement, Terry stated that there was "no ambiguity" to its meaning and that she "cannot and will not return" to work.  Terry now attempts to create a triable issue of fact by saying that she actually meant that no accommodations could be made because the firm was determined to harass her into leaving employment.  Terry cannot create a triable issue by contradicting the clear written evidence on this point.  Evidence of undisclosed subjective intent is irrelevant; the law imputes to a person the intention corresponding to the reasonable meaning of her language, acts, and conduct.  (*Habitat Trust for Wildlife, Inc. v. City of Rancho Cucamonga* (2009) 175 Cal.App.4th 1306, 1339.)  Terry's initial e-mail stated, "*Because of the nature and extent of my injury* there are no accommodations that Morgan Lewis can make that would allow me to return to work at Morgan Lewis." (Emphasis added.)  This language precludes Terry from arguing that it was not her injury that prompted her resignation, but the firm's harassment.

> E.     *Cause of Action for Whistleblowing*

Terry's sixth cause of action for whistleblowing was based on the firm improperly retaliating against her because she attempted to report the firm's supposedly improper billing practices to authorities.  Summary judgment was granted on the basis that there was no evidence the firm ever knew she had attempted to report the practices.

Labor Code section 1102.5, subdivision (b) provides, "An employer, or any person acting on behalf of the employer, shall not retaliate against an employee for disclosing information, or because the employer believes that the employee disclosed or may disclose information, to a government or law enforcement agency, to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance, or for providing information to, or testifying before, any public body conducting an investigation, hearing, or inquiry, if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties."

21

Terry testified that she tried to report the firm to the State Bar for value billing, but she also admitted that nobody at the firm knew she contacted the State Bar to report it. Clearly, the firm could not have retaliated against Terry for blowing a whistle it did not hear.

Terry argues, however, that the firm was aware that she testified about the firm's value billing practices in her deposition in the prior lawsuit, and similarly discussed the practices in declarations she filed in that case. But testifying in a civil deposition about a potential illegal act does not constitute testifying before "any public body conducting an investigation, hearing, or inquiry." The same is true of statements in a declaration. Terry has no authority for the proposition that her testimony in the prior lawsuit was conduct protected by the whistleblower statute, and independent research has disclosed none.

F.      *Cause of Action for Intentional Infliction of Emotional Distress*

Summary judgment was granted on Terry's seventh cause of action for intentional infliction of emotional distress on the twin bases that she did not raise a triable issue of fact of sufficiently extreme and outrageous conduct and the statute of limitations. Both grounds are correct.

" ' "The elements of a prima facie case for the tort of intentional infliction of emotional distress [are] . . . as follows: '(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard [for] the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct.' " [Citation.]' [Citation.]" (*Wilkins v. National Broadcasting Co.* (1999) 71 Cal.App.4th 1066, 1087.) The conduct must be "so extreme and outrageous 'as to exceed all bounds of that usually tolerated in a civilized society.' " (*Ibid.*) Terry has failed to identify any conduct that was so extreme and outrageous as to satisfy this test. While some of the conduct identified by Terry may have upset her, there was nothing that exceeded the bounds that are usually tolerated in a civilized society. (See, e.g., *Grenier v. Taylor* (2015) 234 Cal.App.4th 471, 477, 486-487 [publicly

22

accusing a pastor of child molestation, drug dealing and drug smuggling is sufficiently outrageous].)

Moreover, the statute of limitations for intentional infliction of emotional distress is two years. (Code Civ. Proc., § 335.1.) Terry filed her complaint on March 18, 2013. But, Terry went on disability leave from which she did not return in June 2010. The only act that occurred within the two-year period preceding Terry's complaint was the firm's failure to confirm Terry's employment with HireRight. That act does not constitute intentional infliction of emotional distress.

G.  *Cause of Action for Preventing Subsequent Employment by*
     *Misrepresentation*

Labor Code section 1050 provides: "Any person, or agent or officer thereof, who, after having discharged an employee from the service of such person or after an employee has voluntarily left such service, by any misrepresentation prevents or attempts to prevent the former employee from obtaining employment, is guilty of a misdemeanor." Terry's final (eighth) cause of action was for preventing her from obtaining employment by misrepresentation, due to the firm's failure to confirm her dates of employment with HireRight.

The undisputed evidence, however, is that the firm made no misrepresentation. As soon as the firm was contacted by HireRight, it told Terry it would confirm her correct dates of employment, and simply sought her e-mailed authorization to do so. Terry did not give that authorization, and instead demanded the firm confirm her dates of employment with Zevnik Horton as well. Although the firm initially declined, the firm agreed to do so the day after Terry escalated her request to one of the firm's attorneys. Terry then chose not to submit the necessary forms to the firm, and no information was ever provided. There was simply no misrepresentation, and any failure to convey the information to HireRight was due to Terry's failure to supply the authorization.

23

**DISPOSITION**

The judgment is affirmed.  Respondent is to recover its costs on appeal.


                                        RUBIN, ACTING P. J.

I CONCUR:



        FLIER, J.

**GRIMES, J., concurring.**

I concur in the judgment but must disclaim the majority's digression in dicta regarding the Los Angeles Superior Court's mandatory settlement conference program. Plaintiff contended in the final paragraph of her opening brief that she was prejudiced by the trial court's determination that she could not participate in mandatory settlement conference discussions because she was self-represented. She cited the principle that a self-represented litigant has the right "to appear and conduct his own case." (*Gray v. Justice's Court of Williams Judicial Township* (1937) 18 Cal.App.2d 420, 423.) The right to appear and to be heard is indeed guaranteed, but it is an entirely different question whether anyone has a guaranteed right to a court sponsored mandatory settlement conference. There was no analysis of this issue in the briefing, and nothing in the record relates to the superior court's mandatory settlement conference program. The majority nonetheless chose this appeal as the forum in which to launch a discourse on whether self-represented litigants should be able to participate in settlement conferences. I agree with the majority that plaintiff has not demonstrated error by the trial court in the grant of summary judgment and perceive that is all we are called upon to decide here.


GRIMES, J.


1